T.C. Memo. 1996-350

UNITED STATES TAX COURT

JAMES M. RANKIN AND SHIRLEY RANKIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26270-93.                    Filed July 31, 1996.

<u>David M. Kirsch</u>, for petitioners.

<u>Thomas G. Schleier</u> and <u>Elaine Sierra</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined the following
deficiency in, and additions to, petitioners' 1988 Federal income
tax:

|            | Additions to Tax | |
| Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) |
| $155,255 | $38,485 | $7,856 |

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the principal issue we must decide centers around whether a change in the practice of offsetting, against the gross receipts of petitioner James M. Rankin's (petitioner) bail bond business, payments made into certain accounts maintained for him as part of that business is a change in a method of accounting. If the change in the practice is a change in a method of accounting, then respondent may, pursuant to section 481(a), make an adjustment increasing petitioners' income in connection with the change.

## FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91 and are incorporated herein by reference. We find as facts herein the facts stipulated by the parties.

At the time of filing the petition in the instant case, petitioners resided in Union City, California. Petitioner Shirley Rankin is a petitioner solely by reason of having filed joint returns with petitioner. Petitioner maintained his books and filed his Federal income tax returns using the cash receipts and disbursements method of accounting.

Petitioner is licensed as a bail bond agent by the California Department of Insurance and, since 1968, has been

engaged in the bail bond business in that State.  During 1988, petitioner operated his bail bond business at five different locations in California:  Redwood City, San Jose, Oakland, Hayward, and Vallejo.  On petitioners' 1988 Federal income tax return, petitioner reported income from his bail bond business on four Schedules C.

From the beginning of his bail bond business, petitioner's primary surety company has been Associated Bond & Insurance Agency (Associated), and, during 1988, petitioner executed bail bonds as an agent of Associated.  The terms of petitioner's agency for the period from October 1, 1981, through the time of trial are set out in a written agreement with Associated (agreement).  In prior years, petitioner had a similar agreement with Associated.

A bail bond is a performance bond requiring the appearance of a criminal defendant at judicial proceedings.  The principal on the bond is the defendant; the obligee is California, which requires the defendant's appearance; and the surety is the insurance company writing the bond, which guarantees performance. As a bail bond agent, petitioner is permitted to solicit, negotiate, and execute bail bonds on behalf of a surety company (an insurance company) with which he is affiliated and which he represents when he executes a bond.  Petitioner functions as the agent of the surety company, executing bonds, collecting

premiums, and attempting to assure performance of the bonds on behalf of the surety.

When petitioner writes a bond, he collects 10 percent of the face amount of the bond from a defendant as his earned premium. Pursuant to the agreement, petitioner: (1) Pays 13 percent of the premium collected to Associated, the surety, as a bond cost; (2) pays an additional 10 percent of the premium collected, or 1 percent of the face amount of the bond, to an indemnity fund known as a "Build Up Fund" (BUF); and (3) keeps the remainder of the premium.[1]

The surety company that issues a bond is principally liable to California for assuring a defendant's court appearance. In the event a defendant fails to appear, the surety company has to pay a late surrender fee or forfeiture to California. If a defendant is not brought to court within 180 days of a failure to appear, the court issues a summary judgment in the amount of the bond, resulting in a loss on the bond. The agreement, however, shifts ultimate liability for expenses and forfeitures on each bond from Associated to petitioner, who is personally liable for

---

[1]     During 1988, petitioner executed bonds in the amount of $5,995,543, earning premiums on such bonds in the amount of $599,554. Petitioner collected $581,567 of the earned premiums. During that year, petitioner paid bond costs to Associated in the amount of $77,942 (representing 13 percent of the premiums earned on the bonds sold) and paid $59,955 into his BUF accounts (representing 10 percent of the premiums earned on the bonds sold).

the amount of the loss. In the agreement, petitioner agrees to bring a defendant to court as required by the bond, or, if he fails, to indemnify the surety for any expenses incurred, including a forfeiture. If petitioner brings the defendant to court within the required time, the bond is exonerated and there is no loss. A loss occurs only when petitioner is unable to bring the defendant to court. Petitioner's liability for expenses associated with a bond forfeiture does not arise prior to his obligation to indemnify Associated.[2]

As security for petitioner's promise to indemnify Associated, the agreement requires petitioner to contribute to a BUF account, and amounts paid into the BUF accounts are derived from bond premiums collected. Associated established and maintained BUF accounts for petitioner with the Bank of America and functioned as trustee for petitioner with respect to the BUF accounts. The BUF accounts are required as a necessary condition of petitioner's doing business as a bail bondsman. In accordance with the agreement, the funds in the BUF accounts were accumulated in proportion to the volume of outstanding bonds executed by petitioner on behalf of Associated. Accrued

_____

[2]    Because of his potential liability to Associated in the event of a loss, petitioner's normal practice is to attempt to obtain collateral from his customers as security for such liability. When he is able to obtain collateral, petitioner's normal custom is to accept only cash or a deed of trust on real property. If the collateral is inadequate to pay a loss, petitioner is required to pay the difference from either personal resources or the BUF accounts.

interest, which belonged to petitioner, was accumulated in the accounts. Although Associated is not required to give petitioner notice of any draw on the BUF accounts, petitioner typically received quarterly or semiannual reports and periodically inquired about the status of his accounts.

Only Associated, and not petitioner or California, had the right to withdraw funds from the BUF accounts maintained for petitioner. Although Associated had the right to draw on the BUF accounts, those funds could be used only to satisfy petitioner's obligation to indemnify it, and so its control of the funds' disposition was very restricted. When Associated became liable for a bond forfeiture, it could, but was not required to, draw from a BUF account to pay its obligation to California. Pursuant to the agreement, Associated could forgo indemnity from the BUF account. When a loss occurred, Associated would customarily ask petitioner whether he wanted it to be paid from one of the BUF accounts or from other sources. If petitioner elected to pay the loss from other sources, the BUF account would not be drawn upon, and petitioner would reimburse the surety directly. Historically, petitioner has had a very low rate of payments for forfeitures made from his BUF accounts. During 1988, Associated drew only the amount of $4,633.35 from the BUF accounts maintained for petitioner to satisfy any of petitioner's liabilities pursuant to the agreement. Petitioner paid all of

his other expenses associated with bond forfeitures in 1988 from sources other than the BUF accounts.

Petitioner does not have access to his BUF accounts until the agreement is terminated and all outstanding bonds and all other liabilities petitioner may have to Associated are satisfied. Either petitioner or Associated may terminate the agreement, with or without cause, subject to certain notice requirements. Upon termination of the agreement and satisfaction of all liabilities secured by the BUF accounts, the balance in the BUF accounts is required to be released to petitioner.

On his tax returns since 1968, petitioner offset his gross receipts by the amount contributed to his BUF accounts as a portion of cost of goods sold. However, the parties have stipulated that the offsets claimed by petitioner for payments to the BUF accounts are not properly claimable in any taxable period. Rather, if a forfeiture occurs and Associated is paid out of a BUF account, the amount so paid is properly deductible in the year payment is made. Petitioner reported most, but not all, of the interest accumulated on his BUF accounts on his Federal income tax returns for the taxable years 1968 through 1988.

Pursuant to the practice used by petitioner for accounting for his BUF accounts from 1968 through 1988, petitioner did not claim as deductions on petitioners' tax returns forfeitures or summary judgments paid from the BUF accounts maintained for him.

Rather, the deductions claimed for forfeitures or summary judgments represented only those amounts paid from other sources. Pursuant to that practice, petitioner did not intend to report as income the balances remaining in the accounts upon termination of the agreement and satisfaction of all liabilities secured by them.

As of January 1, 1988, Associated maintained seven separate BUF accounts for petitioner. As of that date, the surety's ledgers for petitioner's BUF accounts reflected the following balances:

| Account | Balance |
| --- | --- |
| Rankin-Johnson | $20,075.58 |
| Rankin-Vallejo | 10,986.80 |
| James M. Rankin (Ann) | 71,420.02 |
| James M. Rankin-Hayward | 5,360.87 |
| James M. Rankin #2 | 92,180.28 |
| Rankin-Carter | 10,294.23 |
| Rankin-Williams | 1,803.70 |

The opening balance of petitioner's BUF accounts as of that date shown in the surety's ledgers was $212,122 (rounded). The amount of accumulated interest on the BUF accounts as of January 1, 1988, shown in the surety's ledgers was $65,623 (rounded). For purposes of calculating the adjustment of petitioners' income to be made pursuant to section 481(a), the opening balance of the BUF accounts as of January 1, 1988, is considered to be $146,499 (rounded), which does not include the amount of $65,623 (rounded) that represents interest accumulated on the BUF accounts as of that date.

As of January 1, 1988, petitioner wholly owned the following BUF accounts:  James M. Rankin (Ann); James M. Rankin-Hayward; and James M. Rankin #2.

## OPINION

Because section 481(a)[3] applies only if there is a change in a method of accounting, the parties' dispute in the instant case centers on whether the change in the treatment for tax purposes of payments into and disbursements from the BUF accounts maintained in the course of petitioner's bail bond business is a change in method of accounting.  If so, respondent may make an

---

[3]

Sec. 481(a) provides:

SEC. 481.  ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of change")--

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

adjustment[4] increasing petitioners' income pursuant to section 481(a).

As set forth in our findings above, from 1968 through 1988, petitioner treated the payments made into the BUF accounts as a cost of goods sold, offsetting the gross receipts of his business. Petitioner did not deduct from his taxable income disbursements from those accounts to reimburse Associated for losses and expenses incurred as a result of bond forfeitures. In Sebring v. Commissioner, 93 T.C. 220, 224-227 (1989), we held that payments into BUF accounts were not deductible when made and that deductions are allowed only for disbursements made to satisfy liabilities.[5] We reasoned that payments into the accounts were "in the nature of a security deposit held for payment of future liabilities." Id. at 226. Petitioners concede that Sebring controls the tax treatment of payments into and disbursements from petitioner's BUF accounts and that petitioner's prior practice of offsetting payments made into the BUF accounts against gross receipts was incorrect.

We must accordingly consider whether the change that was required by respondent for purposes of bringing the tax treatment

---

[4]    The amount of the adjustment, $146,499, essentially represents the Jan. 1, 1988, opening balances of the BUF accounts maintained in connection with petitioner's bail bond business, less interest accumulations.

[5]    The taxpayer in that case, like petitioner, used the cash receipts and disbursements method of accounting. Sebring v. Commissioner, 93 T.C. 220, 221 (1989).

of petitioner's BUF accounts into conformity with our holding in Sebring constitutes a change in petitioner's method of accounting for those accounts.  A change in method of accounting is defined as a "change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan."  Sec. 1.446-1(e)(2)(ii), Income Tax Regs.  A "material item" is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction."  Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  The regulations further provide that "a change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item in income or the taking of a deduction."  Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.  Accordingly, where a taxpayer's practice permanently avoids reporting of income and therefore distorts its lifetime income, the practice is not a method of accounting, and section 481(a) is inapplicable to a change of the practice.  Schuster's Express, Inc. v. Commissioner, 66 T.C. 588, 596-598 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977).

Petitioners attempt to bring themselves within the rule of Schuster's Express by arguing that petitioner's practice of offsetting payments into the BUF accounts against gross receipts was not a method of accounting but simply involved the claim of offsets not allowable in any period.  Petitioners argue that,

because (1) payments into the BUF accounts were not offsettable against gross receipts or deductible in any year, and (2) petitioner had no intention of including those amounts in his income in any future year, the offsets claimed with respect to the payments into the accounts effected a permanent avoidance of reporting of income and a distortion of petitioner's lifetime income.

In response to petitioners' arguments regarding Schuster's Express, respondent argues that the change in petitioner's practice of offsetting payments into the BUF accounts against gross receipts involves the appropriate time for taking those amounts into account and therefore constitutes a change in accounting method. Respondent contends that the offsets claimed with respect to the payments into the BUF accounts would eventually be matched by payments of actual liabilities from the accounts and the receipt by petitioner of the remaining balances of the accounts when they were terminated by Associated, petitioner's surety. Thus, according to respondent, any balances refunded would be required to be included in petitioner's income pursuant to the relevant case law and the tax benefit rule.

Petitioners argue that: (1) Respondent has raised the issue of the tax benefit rule for the first time on brief; (2) they have been denied the opportunity to present evidence concerning its applicability, such as evidence concerning the extent to which prior deductions did not result in a tax benefit and expert

testimony concerning whether a recovery would occur on the termination of petitioner's relationship with Associated; and (3) respondent should bear the burden of proof with respect to the applicability of the tax benefit rule.

We do not consider petitioners to be prejudiced by respondent's limited and responsive reliance on the tax benefit rule. We note that petitioners have placed in evidence their tax returns from 1970 through 1988 (petitioners could not produce copies of their 1968 and 1969 returns) and the surety ledgers for the BUF accounts in issue, which permits as complete an evaluation as practical of the extent of any tax benefit resulting from the deductions claimed by petitioners. We also consider petitioners to have been aware of the relevance of the tax benefit rule to the instant case. In their opening brief, petitioners discuss whether the balances of petitioner's BUF accounts must be included in income when the accounts are closed and attempt to distinguish Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 799 (11th Cir. 1984), which noted that the previously deducted balance of a reserve account is to be included in income when the account ceases to be used. The portion of Knight-Ridder Newspapers that petitioners attempt to distinguish is based on an application of the tax benefit rule.

We further fail to see the value of expert testimony on the matter of whether a recovery would occur on the refunding of the BUF account balances to petitioner. Finally, by relying on the

tax benefit rule, respondent has not raised a new matter for which respondent bears the burden of proof. Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988). We accordingly reject petitioners' attempt to limit our consideration of the applicability of the tax benefit rule in the instant case.

We do not find merit in petitioner's reliance on Schuster's Express, Inc. v. Commissioner, supra. In Schuster's Express the taxpayer maintained insurance expense accounts on the basis of a predetermined percentage of gross receipts and deducted the amount so computed even though its actual insurance expense was less than the estimated amount. The difference between the estimated and actual expense was credited to a reserve account. The Commissioner disallowed the deductions claimed for the amounts credited to the reserve account in the taxpayer's open years and sought, pursuant to section 481(a), to include in the taxpayer's income for the earliest open year the balance of the reserve account as of the end of the preceding year, which comprised additions made in closed years.[6] The Court found that the applicability of section 481(a) constituted a new matter for which the Commissioner bore the burden of proof, stating:

> [the Commissioner], the party on whom the burden of
> proof rests, has not established that under * * * [the

---

[6] Sec. 481(a) permits the making of an adjustment with respect to amounts that were omitted in closed years. Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 571-572 (5th Cir. 1965).

taxpayer's] method of computing insurance expense there was any procedure or intention to restore the excessive deductions to income in future years so as to properly reflect * * * [the taxpayer's] total lifetime income. * * * [66 T.C. at 596.]

Consequently, the Court concluded that the change in the taxpayer's practice of deducting insurance expenses did not involve the question of the proper time for the taking of a deduction, and therefore was not a change in a method of accounting. Id. at 596-597. Accordingly, the Court concluded that no adjustment to the taxpayer's income could be made pursuant to section 481(a) with respect to the balance of the reserve account attributable to closed years. Id. at 597-598.

Subsequent cases have distinguished Schuster's Express, Inc. v. Commissioner, supra, concluding that the practices in question involved issues of the timing of recognition of income, rather than of the permanent avoidance of its reporting. Knight-Ridder Newspapers, Inc. v. United States, supra; North Cent. Life Ins. Co. v. Commissioner, 92 T.C. 254 (1989); Copy Data, Inc. v. Commissioner, 91 T.C. 26 (1988); Primo Pants Co. v. Commissioner, 78 T.C. 705 (1982); Connors, Inc. v. Commissioner, 71 T.C. 913 (1979). Although petitioners argue that those cases are not applicable to the situation presented in the instant case, the circumstances noted by petitioners do not render the reasoning of those cases inapposite.[7] Knight-Ridder Newspapers, Inc. v.

---

[7] For example, certain of those cases involve accrual method
                                                    (continued...)

<u>United States</u>, <u>supra</u>, involved a reserve for anticipated advertising rebate expenses.  The taxpayer added to the reserve and deducted an amount based on its estimated liability for rebates for the year; rebates paid were charged against, and reduced, the reserve.  The court concluded that the rebate reserve was an item affecting the proper timing of a deduction because disbursements from the reserve would be deductible when made and the taxpayer's practice simply accelerated those deductions.  <u>Knight-Ridder Newspapers, Inc. v. United States</u>, <u>supra</u> at 798.  Similarly, in the instant case, a disbursement from one of the BUF accounts in issue would properly be deductible when made, <u>Sebring v. Commissioner</u>, 93 T.C. at 225, and petitioner's practice of offsetting payments into the BUF accounts against the gross receipts of his business in effect accelerated the deductions otherwise allowable.  The court in <u>Knight-Ridder Newspapers</u> further analyzed whether the taxpayer's use of the reserve permanently avoided the reporting of income, reasoning as follows:

> though we talk about the timing of deductions, the
> basic issue is whether income is reflected and taxed.
> The reserve method determines when income will be

[7](...continued)
taxpayers and/or claims of deductions based on estimates of expenses or reserve accounts.  Petitioners point out that petitioner was a cash method taxpayer during relevant times and further contend that the payments into the BUF accounts were not based on estimates of expenses, but on a percentage of bail bond premiums received and that the BUF accounts were not reserves in an accounting sense.

taxed.  When deductions are taken early (at the time money is added to the reserve), an equal amount of income is obviously not taxed.  That income is taxed, however, at the later time when deductions would have been taken under a different system (i.e., at the time rebates are paid, the absence of deductions means that an equal amount of income is taxed).  Most important, at the time the company ceases to use the reserve (e.g., when the company closes out its business), any remaining balance in the reserve must be included in taxable income.  * * *  Thus, no income is avoided altogether.  Any excess deductions in earlier years are offset by an equal amount of taxable income in the final day.  The question becomes one of timing, whether the income is taxed when the amounts are added to the reserve or when the reserve is abandoned on the Day of Armageddon.  * * *  [743 F.2d at 799.]

As noted above, petitioner's practice of offsetting against gross receipts the payments into the BUF accounts in issue reduced the income of his bail bond business earlier than otherwise would have been proper, and concomitantly eliminated deductions at the proper time for claiming them; i.e., when liabilities were paid from the BUF accounts.  Moreover, petitioner's practice did not avoid the reporting of income because, notwithstanding his professed lack of intention to include any of the balances of his BUF accounts in income when they were refunded to him, at the termination of his association with the surety, those balances, to the extent they represented petitioner's payments into those accounts which he treated as current offsets to the gross receipts of his business, would be includable in income.  Knight-Ridder Newspapers, Inc. v. United States, supra at 799; see also Haynsworth v. Commissioner, 68 T.C. 703, 708-714 (1977), affd. without published opinion 609

F.2d 1007 (5th Cir. 1979).  The repayment of those balances to
petitioner would constitute a recovery or an event fundamentally
inconsistent with the premise of the original offsetting against
gross receipts of the payments into the BUF accounts, triggering
application of the tax benefit rule.[8]  Hillsboro Natl. Bank v.
Commissioner, 460 U.S. 370, 383-384 (1983); sec. 1.111-1(a)(2),
Income Tax Regs.  Consequently, petitioner's practice of
offsetting against gross receipts payments into the BUF accounts
in issue constitutes a method of accounting, and the change in
that practice is a change in method of accounting.  Accordingly,
an adjustment may be made pursuant to section 481(a) to prevent

---

[8]     We note that this Court does not require a taxpayer to
include in income the recovery of an amount that was improperly
deducted in a prior year for which the period of limitations has
expired.  885 Inv. Co. v. Commissioner, 95 T.C. 156, 165 (1990).
Several Circuit Courts of Appeals, including the Ninth, to which
an appeal of the instant case would lie (barring stipulation to
the contrary), have rejected the so-called erroneous deduction
exception to the tax benefit rule.  Id.  Accordingly, pursuant to
the rule of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445
F.2d 985 (10th Cir. 1971), we apply the law as announced by the
Court of Appeals for the Ninth Circuit.  Consequently, for
purposes of the instant case, the recovery of the payments into
the BUF accounts would be included in petitioner's income
pursuant to the tax benefit rule notwithstanding that the offsets
against gross receipts claimed for those payments were improper.
Unvert v. Commissioner, 656 F.2d 483, 485-486 (9th Cir. 1981),
affg. 72 T.C. 807 (1979).

the omission[9] or duplication[10] of amounts solely by reason of that change.

Because we have decided that an adjustment to income pursuant to section 481(a) is warranted, we must consider two contentions advanced by petitioners concerning the amount of the adjustment.  Petitioners contend that petitioner owned only a one-half interest in certain BUF accounts,[11] and that therefore only one-half of the relevant balance of those accounts may be included in the section 481(a) adjustment made with respect to the change in the method of accounting for those accounts.  At trial, petitioner testified that he made agreements with certain of his office managers to share the profits and losses of their respective offices, as well as the BUF account for the office. Petitioner produced two agreements, only one of which was in effect on January 1, 1988, the relevant time for purposes of the

---

[9]    Although, even if, pursuant to the tax benefit rule, the previously offset amounts in the BUF accounts would be reportable in income at the time of their refund to petitioner, respondent need not await that eventuality but may make the adjustment provided by sec. 481(a) in the year of the accounting method change. Western Casualty & Sur. Co. v. Commissioner, 571 F.2d 514, 519 (10th Cir. 1978), affg. 65 T.C. 897 (1976).

[10]    A duplication could occur when, pursuant to the new method of accounting, deductions are claimed when disbursements are made from the BUF accounts in issue because the amounts disbursed (to the extent they do not represent accumulated interest) could have already been offset against gross receipts at the time they were paid into the accounts pursuant to petitioner's old method of accounting.

[11]    Those accounts are identified as:  Rankin-Johnson, Rankin-Vallejo, Rankin-Carter, and Rankin-Williams.

section 481(a) adjustment.[12]  Petitioner contends that he made similar agreements with other office managers but is unable to provide copies of them.  Petitioner did not produce any of the office managers as witnesses at trial to corroborate his testimony.  Petitioners acknowledge that we are not bound to accept petitioner's uncorroborated testimony.  Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir.), affg. 41 T.C. 593 (1964).

The agreement in evidence that was in effect at the relevant times, which pertains to the Vallejo office of petitioner's business, contains, inter alia, the following provisions:  (1) A pledge of collateral by the office manager, referred to in the agreement as a bail agent, to secure payment to petitioner of losses incurred by the manager; (2) an agreement to share equally the profits of "James Rankin Bail Bonds" between petitioner and the manager; and (3) an agreement that the two "will share the separate reserve for the Vallejo office".  The agreement does not further specify the nature of sharing intended by the parties or the manner in which it is to be effected.  The agreement is otherwise ambiguously drafted in that it suggests that all profits made by James Rankin Bail Bonds, which, based upon the Schedules C in petitioners' 1987 and 1988 returns, appears to be a business operation different from the bail bond operation

---

[12]    The other agreement was dated Sept. 1, 1988, and concerns the same office as the first agreement.

carried on at the Vallejo office, are to be shared equally between petitioner and the manager of that office.  Petitioner testified, however, that he only shared the profits of the Vallejo office with the other party to the agreement.  There is no further evidence in the record as to the arrangements concerning those purported partnerships.

Other circumstances in the record are inconsistent with petitioners' contention.  The BUF accounts were maintained by Associated only for petitioner, and would be refunded to him alone upon the termination of his association with that surety. The full amount of those accounts was available to Associated for the payment of any liabilities petitioner incurred to Associated. Associated could draw on the BUF accounts without giving notice to petitioner.  Moreover, the parties stipulated that the accrued interest on the BUF accounts in issue belonged to petitioner.  As far as Associated was concerned, the BUF accounts were not jointly owned.

We also note that petitioner's bail bond business is treated as one or more sole proprietorships, and not partnerships, on his income tax returns.  Statements in tax returns constitute admissions that may be overcome only by cogent evidence that they are wrong.  Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Mooneyham v. Commissioner, T.C. Memo. 1991-178; Estate of McGill v. Commissioner, T.C. Memo. 1984-292.  There is nothing in the

record that suggests that the office managers reported on their tax returns a portion of the income and expense associated with their respective offices. Indeed, petitioners assert that petitioners' income tax returns and the surety's ledgers with respect to the BUF accounts in issue contain all the information needed for purposes of the alternative method provided by section 481(b)(2), further discussed below, for computing the amount of the additional tax to be paid as a result of the adjustment required due to the change in the method of accounting for the BUF accounts. Petitioners' assertions and the record as a whole indicate that the full amount of the payments into the BUF accounts were taken as offsets against the gross receipts of petitioner's bail bond business reported on petitioners' tax returns, and petitioners do not contend otherwise. We conclude that petitioners have not established that any of the BUF accounts in issue were jointly owned. Accordingly, no modification of the amount of the section 481(a) adjustment is required for this reason.

Petitioners also contend that, in the event we decide that section 481(a) applies in the instant case, the amount of tax resulting from the adjustment should be limited to the amount computed pursuant to section 481(b)(2).[13] Respondent contends

---

[13] Petitioners do not rely on the limitation provided by sec. 481(b)(1), and we do not consider it.

that petitioners have not satisfied the conditions for employing that method.

Where it applies, section 481(b)(2),[14] in general, limits the increase in tax in the year of change attributable to a section 481(a) adjustment to the net increase in income tax that would result from allocating that portion of the adjustment to prior consecutive taxable years to which it is properly allocable pursuant to the new method of accounting, with the balance of the

_____

[14]    Sec. 481(b)(2) provides as follows:

SEC. 481(b).   Limitation on Tax Where Adjustments Are Substantial.--

*    *    *    *    *    *    *

    (2) Allocation under new method of accounting.--If--

        (A) the increase in taxable income for the year of
    the change which results solely by reason of the
    adjustments required by subsection (a)(2) exceeds
    $3,000, and

        (B) the taxpayer establishes his taxable income
    (under the new method of accounting) for one or more
    taxable years consecutively preceding the taxable year
    of the change for which the taxpayer in computing
    taxable income used the method of accounting from which
    the change is made,

then the tax under this chapter attributable to such
increase in taxable income shall not be greater than the net
increase in the taxes under this chapter (or under the
corresponding provisions of prior revenue laws) which would
result if the adjustments required by subsection (a)(2) were
allocated to the taxable year or years specified in
subparagraph (B) to which they are properly allocable under
the new method of accounting and the balance of the
adjustments required by subsection (a)(2) was allocated to
the taxable year of the change.

adjustment allocated to the year of change. Sec. 1.481-2(b)(3), Income Tax Regs. A taxpayer must establish from its books of account and other records what its taxable income would have been pursuant to the new method of accounting for one or more of the consecutive years immediately preceding the year of change. Sec. 481(b)(2); sec. 1.481-2(b), Income Tax Regs.

The record contains petitioners' Federal income tax returns for the years 1970 through 1987, but not for the years 1968 and 1969. Petitioners could not produce copies of their 1968 and 1969 returns and concede that the portion of the section 481(a) adjustment allocable to those years is to be taken into account in 1988, the year of change. The record also contains the surety's ledgers for each of the BUF accounts in issue, which reflect the payments into and disbursements from each account. Petitioners maintain that those documents contain sufficient information to perform the computations called for by section 481(b)(2) and that those computations may be performed as part of the Rule 155 computation for the instant case.

Respondent maintains that such evidence is insufficient to verify the accuracy of any computation pursuant to section 481(b)(2) and to ascertain petitioners' correct tax for the prior taxable years. Respondent argues that there might be errors in petitioners' prior year returns besides the incorrect method of accounting for the BUF accounts that cannot be identified and that prevent computation of the correct tax for those years.

Respondent contends that petitioners also have failed to provide substantiation for the income and deductions claimed in their returns for those years.

We do not agree with respondent's suggestion that section 481(b)(2) requires a taxpayer to prove the accuracy of every item affecting its tax liability in the years prior to the year of a change in accounting method in order to qualify for the provision's benefits. Rather, a taxpayer need show only what its taxable income would have been in those years using the new method of accounting in order to obtain the benefit of that provision. We, however, do not find that the record contains sufficient evidence to satisfy the requirements of section 481(b)(2). Although we accept the evidence of the payments into and disbursements from the BUF accounts in issue afforded by the surety's ledgers, we do not accept petitioners' tax returns as proof of the gross receipts of petitioner's bail bond business for the years preceding 1988. It is well settled that a tax return merely represents the claim of the taxpayer and does not establish the truth of the matters set forth therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Halle v. Commissioner, 7 T.C. 245, 247-248 (1946), affd. 175 F.2d 500 (2d Cir. 1949). We construe the regulations pursuant to section 481(b)(2), which provide for the use by a taxpayer of its "books of account and other records" to establish its taxable income using the new

method, as contemplating the use of accounting records, rather than tax returns, to carry the taxpayer's burden.  Sec. 1.481-2(b), Income Tax Regs.  We accordingly find that petitioners have failed to introduce sufficient evidence to establish their entitlement to the benefits of section 481(b)(2).

To reflect the foregoing and concessions,

<u>Decision will be entered under Rule 155</u>.