James M. RANKIN; Shirley Rankin, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 97–70334.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1998.

Decided March 13, 1998.

David M. Kirsch, San Jose, California, for petitioners-appellants.

Annette M. Wietecha, Tax Division, United States Department of Justice, Washington, DC, for respondent-appellee.

Before: SCHROEDER, FARRIS and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

As the Tax Code has long acknowledged, the timing of income recognition is a difficult, complicated problem. Rather than exhaustively list when every possible kind of income must be recognized, the Tax Code instead gives taxpayers some latitude in timing their income recognition. Subject to several restrictions, taxpayers may choose a method of accounting that allocates different income to different time periods.

With this latitude, however, come many risks, and one is that when a taxpayer changes his method of accounting, some of his income may be taxed twice or not at all. To guard against this problem, 26 U.S.C. § 481[1] gives the Commissioner of Internal Revenue ("Commissioner") the power to adjust the amount of tax due in the year a taxpayer changes his method of accounting. In this case, we deal with the definition of a "method of accounting" under § 481 and an assessment of the Commissioner's powers under that section. We must also decide what records a taxpayer must keep in order to invoke the tax ceiling in § 481(b)(2)(B).

I

James M. Rankin is a bail bond agent in California.[2] A bail bond is a performance bond requiring the appearance of a criminal defendant at judicial proceedings. The principal on the bond is the defendant; the obligee is the State of California, which requires the defendant's appearance; and the surety is the insurance company writing the bond, which guarantees the defendant's performance.

Rankin's primary surety company is Associated Bond & Insurance Agency ("Associated"), and Rankin executes bail bonds as an agent of Associated. When Rankin writes a bond, he collects 10 percent of the face amount of the bond from a defendant as his earned premium. Pursuant to his agreement with Associated, Rankin: (1) Pays 13 percent of the premium collected to Associated, as a bond cost; (2) pays an additional 10 percent of the premium collected to an indemnity fund known as a "Build Up Fund" ("BUF"); and (3) keeps the remainder of the premium.

Associated, as the surety, is principally liable to California for assuring a defendant's court appearance. The agreement between Associated and Rankin, however, shifts ultimate liability for expenses and forfeitures on each bond from Associated to Rankin, who is personally liable to Associated for the amount of the loss. As security for Rankin's personal liability to Associated, the agreement requires Rankin to contribute to a BUF account. In accordance with the agreement, the funds in the BUF accounts were accumulated in proportion to the volume of outstanding bonds executed by Rankin on behalf of Associated.

Only Associated has the right to withdraw funds from the BUF accounts maintained for Rankin, and it can do so only to satisfy Rankin's obligation to indemnify it. Rankin does not have access to his BUF accounts until the agreement is terminated and all outstanding bonds and all other liabilities Rankin may have to Associated are satisfied. Upon termination of the agreement and satisfaction of all liabilities secured by the BUF accounts, the balance in the BUF accounts is required to be released to Rankin.

On his income tax returns between 1968 and 1988, Rankin offset his gross receipts by the amount contributed to his BUF accounts as a portion of cost of goods sold. However, the parties have stipulated that the offsets claimed by Rankin for payments to the BUF accounts were improper. *See also Sebring v. Commissioner*, 93 T.C. 220, 224–26, 1989 WL 87703 (1989) (holding deductions to a BUF account improper). Rather, if a forfeiture occurs and Associated is paid out of a BUF account, the amount so paid is properly deductible in the year payment is made.

Pursuant to the practice used by Rankin for accounting for his BUF accounts from 1968 through 1988, Rankin did not claim as deductions on his tax returns forfeitures paid from the BUF accounts maintained for him. Also pursuant to that practice, Rankin did not intend to report as income the balances remaining in the accounts upon termination of the agreement and satisfaction of all liabilities secured by them.

---

1. All further statutory citations are to title 26 of the United States Code.

2. Shirley Rankin is a petitioner solely by reason of having filed joint returns with her husband.

In 1993, the Commissioner assessed a deficiency against Rankin under § 481 of $155,255 for his 1988 tax return. Also, additions were assessed to the 1988 return under §§ 6651(a)(1) and 6653(a)(1). Rankin petitioned for review by the Tax Court, which, after a trial: (1) lowered the § 481 deficiency to $86,317; (2) lowered the § 6651(a)(1) addition; and (3) voided the § 6653(a)(1) addition. *See Rankin v. Commissioner*, 72 T.C.M. (CCH) 289, T.C.M. (RIA) 96,350, 1996 WL 426848 (1996). Rankin appeals only the § 481 deficiency, and the Commissioner does not cross appeal.

We have jurisdiction under § 7482(a)(1), and we review the Tax Court de novo on questions of law. *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1413 (9th Cir. 1986). We affirm.

## II

Section 481 of the Tax Code addresses the problems that can arise when a taxpayer switches methods of accounting. "Because different tax accounting methods provide for different dates on which income or deductions are recognized, a switch in accounting methods can create a situation in which a taxpayer is able to deduct the same expense—or is required to recognize the same income—in two separate tax years." *National Life Ins. Co. v. Commissioner*, 103 F.3d 5, 7 (2d Cir.1996). Section 481 avoids these problems by adjusting the taxpayer's income tax in the year in which the change in accounting methods occurs. *See Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 594, 1976 WL 3710 (1976) ("Its purpose is to prevent any income from escaping tax or being taxed twice solely because of a change in method of accounting."), *aff'd*, 562 F.2d 39 (2d Cir.1977) (per curiam). Specifically, § 481(a) provides:

(a) General rule.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change") -

(1) if such computation is under a method of accounting different from the method under which the taxpayer's tax-

able income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted....

■ Thus, the precondition for § 481 to apply is that the taxpayer has switched his "method of accounting." If he did, adjustments are made *only* to compensate for the change in method of accounting. This restriction is important because the Commissioner is normally barred by the statute of limitations from correcting errors made on very old tax returns. However, the statute of limitations does not apply to § 481. *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568, 572 (5th Cir.1965) (noting that "section 481 would be virtually useless if it did not affect closed years").

Rankin first challenges the applicability of § 481. He argues that he did not change his "method of accounting" and that therefore any adjustment under § 481 was improper. We note that § 481 does not define a "method of accounting," so we turn to the regulations: "A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any *material item* used in such overall plan." 26 C.F.R. § 1.446–1(e)(2)(ii)(a) (emphasis added). The regulations state that "[a] material item is any item which involves the proper *time* for the inclusion of the item in income or the taking of a deduction." *Id.* (emphasis added).[3] As the regulations make clear, § 481 concerns only tax errors that involve *when* income is reported—not those concerning *how much* income is reported, or whether a deduction would *ever* have been appropriate. *See generally Knight–Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 797 (11th Cir.1984); *W.A. Holt Co. v. United States*, 368 F.2d 311 (5th Cir.1966); *Copy Data, Inc. v. Commissioner*, 91 T.C. 26, 29–30, 1988 WL 73143 (1988); *Schuster's Express*, 66 T.C. at 597.

---

**3.** An "overall plan of accounting" refers to whether the taxpayer keeps his books on the cash and disbursement method, the accrual method, or some other system. No one argues that Rankin changed his overall plan of accounting.

■ ·To see why Rankin changed his "method of accounting," we need only look at what Rankin used to do, and what he does now. This was Rankin's old system of accounting: All money put into the BUF accounts was deducted at the time it was put into the account. Later withdrawals from the BUF accounts were never deducted. However, when Rankin and Associated terminated their relationship, Rankin would have recognized the leftover money in the BUF accounts as income in the year of termination.[4] The system was invalid because Rankin was not entitled to deduct all the money he put into the BUF accounts in the year of contribution because that was not necessarily the year in which the bond loss expense would be incurred.

This is Rankin's new system of accounting: Rankin no longer deducts payments into the BUF accounts. Rather, he deducts withdrawals *from* the BUF accounts in the year the withdrawal occurs, because this withdrawal is the actual incurring of an expense. When Rankin's agreement with Associated is terminated, he will not recognize the remaining funds in the BUF accounts as income in that year because he already recognized them as income in the year earned, *i.e.,* by never deducting (offsetting) this money in the first place.

It is plain to us that this switch in Rankin's accounting practices has altered the timing of income recognition. Money that was put into the BUF accounts and was *not* spent by Associated, used to be recognized as income in the year of termination of the agreement, but now is recognized as income in the year earned. Money put into the BUF accounts that *was* spent by Associated used to be deducted in the year deposited, but now is deducted in the year withdrawn.

Rankin attempts to escape this reasoning by pointing out that his old method of accounting was an invalid one. The argument seems to be that § 481 does not apply if the taxpayer moved from an invalid method of accounting to a valid one because such a switch is merely an end to the practice of taking impermissible deductions—and § 481

applies only to changes that affect the timing of income recognition, not changes that affect the lifetime quantity of income recognized. Rankin's argument is somewhat overstated. It is certainly true that *one* reason a system of accounting might be invalid under the Tax Code is that it involved the taking of deductions that would have been improper in *any* year. In that case, ending this system and moving to a valid system would have nothing to do with the timing of income recognition, and § 481 would not apply. But a system of accounting might also be invalid because it involved deductions that, though improper in the year taken, would have been proper *in a different year.* In the latter case, the switch to a new, valid system of accounting would indeed amount to a change in the "method of accounting" because the switch would alter the timing of income recognition.

Rankin's case is of the latter kind. We acknowledge that in no single year would it ever have been appropriate for Rankin to deduct all the money he put into the BUF accounts—for the very simple reason that contributions to a BUF account are the equivalent of the taxpayer's taking money out of one pocket and putting it into another. *Sebring,* 93 T.C. at 224–26. But what Rankin forgets is that some of the money he put into the BUF accounts would eventually be spent on bond losses, and that portion could be deducted in the year of expenditure. As for the unspent BUF money, Rankin's practice of deducting the contribution and then recognizing the income only when he ceased working with Associated effectively delayed income recognition for decades, and this delay no longer occurs. Thus, Rankin's move from an invalid to a valid accounting method altered the timing of deductions and income recognition and falls within the ambit of § 481.

### III

Having concluded that Rankin changed his method of accounting, we now turn to § 481(a)(2) and ask whether the Commission-

---

4. Both parties agree that Rankin did not subjectively intend to recognize the money leftover in the BUF accounts as income *in any year.* However, Rankin concedes that under the tax benefit rule, he would have had to recognize this money as income, even under his old system of accounting.

er's adjustments to Rankin's 1988 tax return were "necessary solely by reason of" Rankin's change in accounting practices. Remember: Section 481 is not an excuse for the Commissioner to go rooting through old tax returns to find any errors Rankin made in the past. Such an inquiry is barred by the statute of limitations. *Knight–Ridder*, 743 F.2d at 797. The only goal of § 481 is to deal with the change in accounting practices. *Id.*

■ Rankin makes three arguments concerning the Commissioner's adjustments. First, he argues that no adjustment under § 481 is necessary because under any method of accounting he must ultimately recognize the unspent BUF funds as income. This statement of the law is true but irrelevant. As Rankin admits by his use of the term "ultimately," his old accounting system altered the *timing* of income recognition. By deducting the unspent BUF funds in the year they were deposited into the BUF accounts and then recognizing them as income decades later when he terminated his relationship with Associated, Rankin effectively transformed his BUF accounts into a tax shelter, delaying the recognition of tens of thousands of dollars of income for the duration of his entire professional life. Worse, having already deducted this money long ago, Rankin now seeks (under his new method of accounting) *not* to recognize these funds as income in the future. The result would be a windfall of untaxed income, due solely to Rankin's change in accounting methods. This is exactly what § 481 is designed to prevent.

Second, Rankin makes an entirely specious claim that his switch in accounting methods would not create duplicate deductions. Under Rankin's old system, he deducted money when he put it into the BUF accounts; under his new system, he deducts it when he takes it out. For money deposited (and deducted) under the old system but then withdrawn (and again deducted) under the new system, Rankin makes the remarkable claim that there is no duplicate deduction. The theory is that the initial deduction was an "offset to gross income" as a cost of doing business, while the subsequent deduction was a true deduction for cost of goods sold because it reflected his actual bond loss expense. If

there is a difference between an offset to gross income and a deduction, we are unable to see what it is, and we are not about to ignore the possibility of duplicate deductions because of mere wordplay.

Third, Rankin argues that even if an adjustment is necessary under § 481, it was too large in this case. In Rankin's view, the *only* problem his change in accounting methods could have produced was the possibility of a duplicate deduction of bond loss expenses, *i.e.*, the duplication discussed in the previous paragraph. Rankin explains that this duplication is in fact a very limited problem. Because a bail bond will either be forfeited or not within 180 days of being issued, depending on whether the criminal defendant shows up in court within the required 180 days, Rankin's liability on a particular bond is for only a short duration. Consequently, when Rankin switched accounting methods on January 1, 1988, any bonds issued before 1987 that had not already been forfeited would never be forfeited. For those bonds, there was no possibility that Rankin would deduct in a later year a bond loss expense that he had deducted in an earlier year. Thus, there was no possibility of duplicate deductions.

What Rankin ignores is that duplicate deductions are not the only problem created by his change in accounting methods. The other problem is income that is never recognized. The money in Rankin's BUF accounts on January 1, 1988, that was put there for bonds executed before 1987, had been deducted from gross income in the year of deposit, so it had never been taxed as income. Under Rankin's new system of accounting, this money never will be taxed as income because Rankin no longer recognizes unspent BUF funds as income in the year his relationship with Associated is terminated. Thus, this money escapes taxation altogether unless it is included in the Commissioner's adjustments. Therefore, Rankin's argument must fail.

Consequently, we affirm the amount of the Commissioner's adjustments.

## IV

The final argument in this case concerns Rankin's attempt to invoke the tax ceiling in § 481(b)(2). One of the defects of § 481(a) is that it assigns all the adjustments due to the change of accounting methods to the year in which the change takes place. This can create enormous tax liability in the year of the change, presenting a problem for taxpayers who wish to change methods of accounting. To protect taxpayers, Congress enacted § 481(b)(2), a spreadback provision that:

> allows the taxpayer to spread the omitted income back over the years in which he would have reported it under the new system. He then computes the additional tax he would have paid in those years under the new system. This amount is a ceiling on the tax increase resulting from section 481.

*Graff Chevrolet,* 343 F.2d at 572. Specifically, § 481(b)(2) provides:

> (2) Allocation under new method of accounting.—
> If—
>> (A) the increase in taxable income for the year of the change which results solely by reason of the adjustments required by subsection (a)(2) exceeds $3,000, and
>> (B) the taxpayer establishes his taxable income (under the new method of accounting) for one or more taxable years consecutively preceding the taxable year of the change for which the taxpayer in computing taxable income used the method of accounting from which the change is made,
> then the tax under this chapter attributable to such increase in taxable income shall not be greater than the net increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if the adjustments required by subsection (a)(2) were allocated to the taxable year or years specified in subparagraph (B) to which they are properly allocable under the new method of accounting and the balance of the adjustments required by subsection (a)(2) were allocated to the taxable year of the change.

In order to invoke § 481(b)(2), a taxpayer must satisfy the precondition in § 481(b)(2)(B), *i.e.,* that the taxpayer "establishes" what his taxable income for the years preceding the change *would have been* under the new method of accounting. The question in this case is whether Rankin has satisfied this precondition. The Tax Court acknowledged that Rankin had submitted his federal income tax returns for the years 1970 through 1987, as well as Associated's records for the BUF accounts, but it concluded that this was not enough to satisfy the § 481(b)(2)(B) precondition. The statute does not specify what records suffice to "establish" what the taxpayer's income would have been for the previous years, but the regulations require the taxpayer to use his "books of account and other records." 26 § C.F.R. 1.481–2(b). Because Rankin no longer has these documents, the tax court ruled that he could not invoke § 481(b)(2).

Faced with the clear language of the regulations,[5] we must reluctantly affirm. We are troubled, however, by the stringent record retention requirements of 26 C.F.R. § 1.481–2(b) with respect to tax years on which the statute of limitations would ordinarily have run years ago. The cap created by § 481(b)(2)(B) is designed to protect taxpayers from the harsh consequences of allocating all adjustments due to a change in accounting methods to the year of the change. These consequences are especially harsh when the change in accounting methods implicates decades of old tax returns, yet this is precisely when the regulations make it most difficult to invoke the tax ceiling. It is unrealistic to expect taxpayers to keep their

---

**5.** We reject Rankin's argument that taxable income under § 481(b)(2)(B) is "established" pursuant to the method described by § 1314. The regulations state that § 1314 prescribes the method for computing the tax ceiling imposed by § 481(b)(2). 26 C.F.R. § 1.481–2(c)(7). But before we get to that point, Rankin must first "establish" what his income would have been in the past years under the new system of accounting. § 481(b)(2)(B). The regulations are perfectly clear that § 1314 does not govern this precondition and that Rankin must provide his "books of account and other records" to "establish" what his income would have been. 26 C.F.R. § 1.481–2(b).

books of account for tax returns submitted decades ago, and imposing this requirement severely restricts the availability of the tax ceiling.

Nonetheless, we are forced to acknowledge that 26 C.F.R. § 1.481–2(b) does make at least some sense. The tax ceiling created by § 481 is intended to benefit taxpayers who change methods of accounting, but it presents the risk that in calculating what the taxpayer's income *would have been* in previous years, a lot of creative accounting could go on. Furthermore, erroneous deductions taken in past years would be repeated in the current year (that is, in calculating the tax ceiling) if the taxpayer could rely solely on his past tax returns to prove what his income would have been. One way to avoid the repetition of past mistakes is to require the taxpayer to submit actual business records rather than his conclusory tax returns. Thus, although we recognize that the regulations limit the availability of the § 481 tax ceiling, we can see the policy rationale for this.

In any event the regulation is unambiguous; accordingly, the tax ceiling is unavailable to Rankin.

**AFFIRMED.**