**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAPITAL ONE FINANCIAL
CORPORATION, and Subsidiaries,

*Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellee.*

⎱ No. 10-1788

THE CLEARING HOUSE ASSOCIATION
L.L.C.,

*Amicus Supporting Appellant.*

Appeal from the United States Tax Court.
(Tax Ct. No. 24260-05)

Argued: September 20, 2011

Decided: October 21, 2011

Before WILKINSON, NIEMEYER, and FLOYD,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge Floyd joined.

**COUNSEL**

**ARGUED:** Jean A. Pawlow, MCDERMOTT, WILL & EMERY, LLP, Washington, D.C., for Appellant. Deborah K. Snyder, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Elizabeth Erickson, Kevin Spencer, MCDERMOTT, WILL & EMERY, LLP, Washington, D.C., for Appellant. John A. DiCicco, Acting Assistant Attorney General, Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Bruce E. Clark, H. Rodgin Cohen, Diana L. Wollman, David A. Castleman, SULLIVAN & CROMWELL LLP, New York, New York, for Amicus Supporting Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

This case presents two questions, each born of the efforts of Capital One, a credit card issuer, to defer significant tax liability. The first question is whether Capital One can retroactively change the method of accounting used to report credit-card late fees on its 1998 and 1999 tax returns in such a fashion as would reduce its taxable income for those years by roughly $400,000,000. The second is whether Capital One can deduct the estimated costs of coupon redemption related to its MilesOne credit card program before credit card customers actually redeem those coupons. We cannot accept Capital One's views on either of the questions herein. For the reasons that follow, we shall affirm the judgment of the Tax Court.

I.

A.

Capital One is a publicly held financial and bank holding company. Its principal subsidiaries, Capital One Bank

("COB") and Capital One, F.S.B. ("FSB"), provide consumer-lending products and issue Visa and MasterCard credit cards. Capital One earns part of its income from a variety of fees associated with its lending services, including late fees charged to customers who do not make their payments on time, overlimit fees charged to customers who exceed their credit limits, interchange fees on purchase transactions, and cash advance fees. In 1998 and 1999, late fees comprised a larger percentage of Capital One's annual income than any other single type of fee.

In its 1998 tax return, Capital One changed its tax treatment of income from certain fees in response to the Taxpayer Relief Act of 1997 ("the TRA"). Pub. L. No. 105-34, § 1004, 111 Stat. 788, 911 (1997) (partially codified at I.R.C. § 1272(a)(6)). The TRA extended original issue discount treatment for federal income tax purposes to certain credit card revenues, or "any pool of debt instruments the yield on which may be affected by reason of prepayments." I.R.C. § 1272(a)(6)(C)(iii). Original issue discount ("OID") is defined in the Code as "the excess (if any) of [a debt instrument's] stated redemption price at maturity, over . . . the issue price." I.R.C. § 1273(a)(1). Under the Code, the gain from OID is included in gross income as interest over the obligation's duration, rather than entirely at the time the debt instrument is issued or is redeemed. *See* I.R.C. § 1272(a)(1). With respect to certain credit card fees that Capital One historically included as income when charged to the customer, changing to an OID accounting method would spread the fee income over the period between when the fee was first charged and when it was reasonably expected to be collected from the credit card holder. *See* I.R.C. § 1272(a)(3)-(6).

To change accounting methods, a taxpayer must first obtain the consent of the Secretary. *See* I.R.C. § 446(e) (a taxpayer who intends to change his method of accounting "shall, before computing his taxable income under the new method, secure the consent of the Secretary"). To request the Secretary's con-

sent, a taxpayer typically files a Form 3115, "Application for Change in Accounting Method." *See* Treas. Reg. § 1.446-1(e)(3)(i). With respect to the TRA, Revenue Procedure 98-60 clarifies that a taxpayer can secure "automatic consent" to change accounting methods due to the enactment of § 1272(a)(6)(C)(iii) as long as the taxpayer timely files and correctly fills out Form 3115. Rev. Proc. 98-60, § 6.01-02, app. § 12, 1998-2 C.B. 761.

COB, but not FSB, did file a Form 3115 with its 1998 income tax return. In its form, COB stated: "Capital One Bank (COB), a domestic corporation, requests permission under Section 12.02 of Rev. Proc. 98-60 to change its method of accounting for interest and original issue discount that are subject to the provisions of Section 1004 of the Taxpayer Relief Act of 1997." In the Form 3115, the taxpayer is required to "provide a detailed description of the pool(s) of debt instruments and the proposed [accounting] method" to be adopted. Rev. Proc. 98-60, app. § 12.02. COB specified that the "pool of debt instruments consists of all credit card receivables held by the taxpayer" and "[t]he proposed method is to account for interest and OID as required by Section 1272(a)(6)." Adopting this proposed change in accounting method, Capital One reported income from overlimit fees, cash advance fees, and interchange fees as OID in its 1998 and 1999 returns.

Capital One did not, however, report late-fee income as OID in those returns. Rather it continued to recognize this income under the current-inclusion method, meaning at the time those fees were charged to cardholders. Had Capital One treated late fee revenue as OID it would have deferred millions of dollars of tax liability by distributing the revenue over the period between when the fee was charged and when the customer was expected to actually pay the fee.

## B.

At the same time, Capital One in 1998 began its "MilesOne program." In exchange for an annual membership fee, partici-

pants were issued Visa and MasterCard "MilesOne" credit cards and earned "miles" for every dollar charged on a Miles-One credit card account. Participants could earn up to an additional 3,000 miles for balances transferred to their MilesOne account and were limited to a maximum of 10,000 miles earned per billing cycle. Once sufficiently accumulated, these miles were redeemable for airline tickets purchased by Capital One.

In 1998 and 1999, Capital One estimated future redemption costs related to its MilesOne program and deducted this amount on its tax returns for those years. An accrual-method taxpayer such as Capital One is generally prohibited from deducting estimated future costs, *see* I.R.C. § 461(h), with an exception when a "taxpayer issues trading stamps or premium coupons with sales . . . and such stamps or coupons are redeemable by such taxpayer in merchandise, cash, or other property," Treas. Reg. § 1.451-4(a)(1). Where the exception applies, the reasonable estimated redemption costs are deducted from "gross receipts with respect to sales with which trading stamps or coupons are issued." *Id.* Capital One relied on this exception when it claimed current deductions for estimated liability for future airline tickets in the amount of $583,411 for 1998 and $34,010,086 for 1999. Upon audit, the Commissioner disallowed the deductions on the basis that the rewards program reserve estimates did not qualify for the § 1.451-4 exception.

### C.

Capital One brought suit in the Tax Court contesting, *inter alia*, the Commissioner's disallowance of deductions claimed for estimated miles redemption costs. In an amended petition, Capital One also sought to change its accounting method for late fees for 1998 and 1999. Seven years after filing its 1998 and 1999 tax forms Capital One sought to retroactively report late fees as OID and so reduce its taxable income by $209,143,757 for 1998 and by $216,698,486 for 1999. The

Commissioner and Capital One filed cross-motions for partial summary judgment with respect to the late fees issue (taxpayers' motion was limited to COB) and the Tax Court granted the Commissioner's motion.

The Tax Court held that Capital One could not retroactively change its treatment of COB's and FSB's late-fee income for 1998 and 1999 because it would be an "impermissible change in method of accounting" under I.R.C. § 446(e). *Capital One Fin. Corp. v. Comm'r*, 130 T.C. 147, 170 (2008). According to the court, Capital One was required to secure the Commissioner's consent to change its accounting method and it failed to do so with respect to its treatment of late-fee income on its 1998 and 1999 returns. The court emphasized that the consent requirement serves an important purpose, "to assure consistency in the method of accounting used for tax purposes and thus prevent distortions of income which usually accompany a change of accounting method and which could have an adverse effect upon the revenue." *Id.* at 154.

After a bench trial, the Tax Court also disallowed Capital One's deduction of estimated costs associated with the rewards program. The court held that the taxpayers' MilesOne program did not constitute "sales" as required by Treasury Regulation § 1.451-4. Rather, Capital One's lending "provide[s] a service, but that service does not transform a loan into a sale" for purposes of § 1.451-4. *Capital One Fin. Corp. v. Comm'r*, 133 T.C. 136, 200 (2009). Interpreting § 1.451-4, the Tax Court explained that "[t]he regulation encompasses a sale of services, but it does not follow that every *provision* of services is a *sale* of services." *Id.* In addition, the court held that Capital One did not have "gross receipts" under the regulation from which to deduct the estimated costs because "Capital One did not issue miles with respect to the revenues Capital One earned." *Id.* at 201.

This appeal by Capital One followed. We review the Tax Court's decision under the same standard as district court civil

bench trials. *Ripley v. Comm'r*, 103 F.3d 332, 334 n.3 (4th Cir. 1996). The grant of the Commissioner's motion for partial summary judgment on the late fees issue is reviewed *de novo*. *See Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 274 (4th Cir. 1995). Questions of law and statutory interpretation are reviewed *de novo* and findings of fact for clear error. *Waterman v. Comm'r*, 179 F.3d 123, 126 (4th Cir. 1999).

## II.

We shall review in this section the late fees issue and then in the next section address the MilesOne program. As will be explained, to accept taxpayers' position on either issue would invite uncertainty and confusion in tax administration.

## A.

As to late-fee income, Capital One seeks to retroactively change accounting methods years after it selected and implemented an alternative method. The purported change would reduce Capital One's taxable income for 1998 and 1999 by approximately $400,000,000. To allow such changes without the prior consent of the Commissioner would roil the administration of the tax laws, sending revenue projection and collection into a churning and unpredictable state. Belated attempts to change accounting methods "would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws." *Pac. Nat'l Co. v. Welch*, 304 U.S. 191, 194 (1938). For that reason, the Supreme Court has held that once a taxpayer has reported income according to a particular method it must live with that choice—the taxpayer has "made an election that is binding upon it and the commissioner." *Id.* at 195.

In its 1998 and 1999 returns Capital One accounted for late fees under the current-inclusion method and did not report late fees as OID. At the time, Treasury had yet to clarify

exactly which credit card revenues were to be treated as OID under § 1272(a)(6) and it was not until 2004 that the IRS informed taxpayers that late fees may be treated as such. *See* Rev. Proc. 2004-33, 2004-1 C.B. 989. Starting with its 2000 tax return, Capital One began and has continued to report late fees as OID. Although the Commissioner concedes that as a general matter late-fee income may be treated as OID, the question is whether Capital One may retroactively treat such income in that fashion on its 1998 and 1999 returns. We hold that it may not.

The critical problem for Capital One is that it never secured the necessary consent to make the sought-after change. Both statute and regulation require a taxpayer to secure consent to change accounting methods and to do so *prior* to calculating taxable income. Section 446(e) of the Code instructs that a taxpayer who intends to change accounting methods, "shall, *before* computing his taxable income under the new method, secure the consent of the Secretary." I.R.C. § 446(e) (emphasis added); *see* Treas. Reg. § 1.446-1(e)(3).

The consent requirement serves several valuable functions, equipping the Commissioner with "leverage to protect the fisc, to avoid burdensome administrative uncertainties, and to promote accounting uniformity." *Diebold, Inc. v. United States*, 16 Cl. Ct. 193, 208 (1989), *aff'd*, 891 F.2d 1579 (Fed. Cir. 1989); *see Barber v. Comm'r*, 64 T.C. 314, 319-20 (1975). The requirement thus helps to regularize the collection of the revenue. It prevents distortions and inconsistencies in reporting and ensures that income does not get taxed twice or escape taxation altogether. *See Rankin v. Comm'r*, 138 F.3d 1286, 1287 (9th Cir. 1998). The Commissioner is therefore vested with broad discretion to grant or withhold consent, *see Brown v. Helvering*, 291 U.S. 193, 203 (1934), and may "condition[ ] consent on the taxpayer's agreement to make correcting adjustments in his income tax payments." *Witte v. Comm'r*, 513 F.2d 391, 394 (D.C. Cir. 1975). Such adjust-

ments required for a change in method of accounting are made pursuant to I.R.C. § 481(a).

The law thus requires what common sense would suggest. Section 446(e)'s prerequisite of prior consent forecloses precisely what Capital One attempts here—it prevents "taxpayers from unilaterally amending their tax returns simply because they have discovered that a different method of accounting yields a lower tax liability than the method they originally chose." *Diebold*, 891 F.2d at 1583. If unilateral changes were permitted the administrative costs would be severe; "the IRS would be required to multiply its detection and examination efforts to prevent abuse of unconsented retroactive changes." *Diebold*, 16 Cl. Ct. at 208. Moreover, retroactive change would become the exclusive tool of those seeking to reduce taxable income; "uniformity in accounting would become a function of financial advantage and the administrative difficulties of detecting unwarranted unilateral changes would be multiplied." *FPL Grp., Inc. v. Comm'r*, 115 T.C. 554, 574 (2000). Capital One's effort to reduce its taxable income by roughly $400,000,000 exemplifies the potential for abuse if we were to give the green light to retroactive changes without prior consent.

## B.

Capital One claims, however, that it was not subject to the general consent requirement to change its tax treatment of late-fee income. This argument misfires in a number of ways.

## 1.

Capital One first contends that it did not need to secure consent because it was rectifying the use of an improper accounting method. Capital One points to the language of I.R.C. § 1272(a)(6)(A), which directs that OID "shall be determined" with respect to any debt instrument to which the statute applies. Capital One maintains that because the

accounting changes provided for by the Taxpayer Relief Act are mandatory, it was required to report late fees as OID and therefore does not need consent to retroactively comply with this requirement.

The alleged necessity of the change, however, is beside the point. Regardless of whether Capital One was required to change the tax treatment of late-fee income in 1998 and 1999 (which is a matter of dispute), a taxpayer remains obliged to secure consent even when changing from an improper to a proper method. In *Diebold*, for example, the court held that "even if [taxpayer] were correcting an erroneous characterization . . . the correction would still be considered a change in the method of accounting" for which consent is required. 891 F.2d at 1583; *see also Pac. Enters. v. Comm'r*, 101 T.C. 1, 19 (1993) ("[I]t is not sufficient that petitioner merely show the correctness of a new method; that fact alone cannot justify a change without the Secretary's consent."); Treas. Reg. § 1.446-1(e)(2)(i) ("Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.").

Revenue Procedure 98-60, which provides the procedures for making changes in accounting to comply with the TRA, specifically forbids a retroactive change in method of accounting without Commissioner authorization. Rev. Proc. 98-60, § 2.04. This prohibition applies "regardless of whether the change is from a permissible or an impermissible method," *id.*—and with good reason. What is permissible or impermissible will often be a matter of interpretation or dispute as to which the taxpayer cannot arrogate to itself the right to make a unilateral determination. Moreover, as the D.C. Circuit has recognized, the consent rules have equal "vitality" when the change in method is from an impermissible to a permissible one for the "danger of distortion of income detrimental to governmental revenues exists regardless." *Witte*, 513 F.2d at 394.

While we appreciate Capital One's expressed enthusiasm for complying with the requirements of the TRA, it is impossible to overlook its financial incentives to make the retroactive change. Capital One insists that this case differs from *Diebold*, where the taxpayer sought to change its returns "simply because [it] discovered that a different method of accounting yields a lower tax liability than the method [it] originally chose." *Diebold*, 891 F.2d at 1583. Capital One maintains that it was not trying to obtain a better tax result but only to comply with the TRA. Capital One's persistent effort in litigation to reduce its taxable income by approximately $400,000,000, however, speaks for itself. In all events, the alleged reason or motive for a change in method of accounting does not eliminate the need to obtain consent.

## 2.

Capital One secondly asserts that it did not need consent because the Taxpayer Relief Act obviated the general consent requirement of I.R.C. § 446(e). It makes much of the "automatic consent" provision of the TRA, which provides that a change in accounting method to comply with the new OID rules "shall be treated as initiated by the taxpayer" and "such change shall be treated as made with the consent of the Treasury." Pub. L. No. 105-34, § 1004(b)(2). Capital One complains that the Tax Court mistakenly gave short shrift to § 1004(b)(2) merely because it was never codified.

Taxpayers' argument misses the mark for several reasons. Section 446(e) requires that taxpayers receive consent before a change in accounting method "except as otherwise expressly provided *in this chapter*." I.R.C. § 446(e) (emphasis added). As an uncodified provision not contained in the chapter, section 1004(b)(2) does not qualify as an exception under section 446(e)'s express language. But irrespective of the fact that § 1004(b)(2) was not made part of the Code, a taxpayer is still required to file a Form 3115 where automatic consent applies. "Automatic consent" is in fact something of a misnomer

because it does not exempt taxpayers from filing requirements nor do away with the Commissioner's oversight of changes in accounting. *See, e.g.*, *PPL Corp. v. Comm'r*, 135 T.C. 176, 179 (2010) (taxpayer made automatic method change by filing Form 3115).

Rather, whereas a taxpayer must typically wait for the Commissioner to grant a Form 3115 application, automatic consent allows a taxpayer to assume consent once all predicate procedures—such as filing a Form 3115—are properly followed. *See* Stanley I. Langbein, *Federal Income Taxation of Banks & Financial Institutions* ¶ 2.06[2] (2011) (explaining the Form 3115 filing requirements for matters subject to automatic consent). The filing of the Form 3115 remains, however, an indispensable part of the automatic consent process, which streamlines accounting method changes without compromising the Commissioner's supervisory role. The Form 3115 puts the IRS on notice and provides it an opportunity to review the change in method of accounting and to intervene if the taxpayer has not followed proper procedure for obtaining automatic consent. Automatic consent procedures are therefore not meant to leave the Commissioner in the dark or to undercut in any fashion the purposes of the consent requirement set forth above.

Revenue Procedure 98-60 makes this clear with respect to automatic consent under the TRA. It explains that a taxpayer can secure "automatic consent" to change accounting methods due to the enactment of the TRA if the taxpayer timely files and correctly fills out Form 3115. Rev. Proc. 98-60, § 6.01-02, app. § 12. However, the change will be treated as initiated "without . . . the consent of the Commissioner as required by § 446(e)" if the taxpayer does not "comply[ ] with all the applicable provisions of th[e] revenue procedure." *Id.* § 6.06. The district director may recommend that the change in accounting method be modified or revoked if upon review he discovers that it was based on inaccurate factual representations, that taxable income adjustments required for a change

in accounting method were not made under I.R.C. § 481(a), or applicable procedures were not followed. *Id.* § 9.01. Thus, even where automatic consent governs, the aims promoted by the § 446(e) consent requirement (ensuring that changes are made accurately, and that revenue is reported consistently) remain in place.

As the Joint Committee on Taxation noted, § 1004(b)(2) invited the IRS to issue automatic-consent procedures for taxpayers to change methods of accounting under the TRA. Staff of J. Comm. on Tax'n, 105th Cong., *General Explanation of Tax Legislation Enacted in 1997* (JCS-23-97), at 192 n.214 (Comm. Print 1997) (citing IRS Notice 97-67, 1997-2 C.B. 330). The IRS did so in Revenue Procedure 98-60, which is explicit that it provides the "exclusive procedure for a taxpayer within its scope to obtain the Commissioner's consent." Rev. Proc. 98-60, § 4.01. Capital One's effort to end-run the consent requirement with respect to late fees is therefore unavailing.

## C.

Doubling back, Capital One argues that even if it was required to secure consent, COB did so when it filed a Form 3115 with its 1998 tax return.[1] In its form, COB proposed to "change its method of accounting for interest and original issue discount that are subject to the provisions of Section 1004" of the TRA. The form also indicated that the "pool of debt instruments consists of all credit card receivables held by the taxpayer" and the "proposed method is to account for interest and OID as required by Section 1272(a)(6)." Capital One argues that this application sufficed to secure consent to change the reporting treatment of late-fee income.

---

[1]It is manifestly the case that FSB did not secure consent because it never filed a Form 3115.

We are unpersuaded that COB's 3115 filing was sufficient. As a threshold matter, COB's late-fee income is a "material item" for which specific consent was necessary to change its accounting treatment. It is true that consent is required under I.R.C. § 446(e) only for proposed changes to a method of accounting. But Treasury Regulation § 1.446-1 defines a change in method of accounting broadly to encompass "a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan." Treas. Reg. § 1.446-1(e)(2)(ii)(a). A material item is in turn defined as "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." *Id.* To secure consent for a change the taxpayer must file a Form 3115 and specify in the form "all classes of items that will be treated differently under the new method of accounting." *Id.* § 1.446-1(e)(3)(i).

Capital One would like to raise the level of generality for defining "item" of income. It argues that late fees are not their own item but merely a component of interest and OID, which were listed on COB's form. But as the Tax Court recognized, "[d]efining item in this way would severely undermine the reasons for section 446(e)." *Capital One Fin. Corp.*, 130 T.C. at 161. Indeed, it is hard to imagine any other source of revenue that would qualify as an item, let alone a material item, if COB's late fees do not.

Late fees are earned each year and are listed as a separate item on Capital One's income statements. Not only are late fees earned on a different basis than other types of fees, but they also comprised a larger percentage of taxpayers' annual income than any other single type of fee. On COB's and FSB's consolidated return in 1998, for example, late-fee income amounted to approximately 22 percent of the gross receipts and 15 percent of the total income reported. *See Pac. Enters.*, 101 T.C. at 23 (holding that an item was material, in part, "because of the large dollar amount involved"); *Wayne Bolt & Nut Co. v. Comm'r*, 93 T.C. 500, 510-12 (1989)

(same). For all these reasons, the Tax Court was correct to conclude that late fees constitute a material item for which independent consent was necessary to change accounting methods.

The burden is on the party seeking consent to make both its intentions and its requests to change a material item clear. At best, the language in COB's application served to obscure rather than clarify. The language was broad and ambiguous respecting which fees, if any, COB was treating as OID. Capital One's claim that COB's Form 3115 was clear rings hollow when one realizes that COB's filing failed even to mention late-fee income, the very item for which a change in accounting method is now sought. What is more, COB dispelled any ambiguity by the way it effectuated the change in accounting method after it filed the Form 3115. In 1998 and 1999 COB reported income from overlimit fees, cash advance fees, and interchange fees as OID. Yet it continued to recognize late-fee income under the current-inclusion method. It is ironic that Capital One now expects us to interpret the Form 3115 in a manner that not even the author of the form intended it at the time.

COB's actual practice is fatal to its claim in another respect. Had COB received consent to treat late-fee income as OID, that consent would have been vitiated by continued use of the current-inclusion method. Treatment of a material item consistently in two or more consecutively filed tax returns constitutes a method of accounting for which consent is required to change—even if that treatment is erroneous or an incorrect application of a chosen method. *See* Treas. Reg. § 1.446-1(e)(2)(iii) (Examples 6-8); Rev. Rul. 90-38, 1990-1 C.B. 57; *see also Huffman v. Comm'r*, 518 F.3d 357 (6th Cir. 2008). Therefore, the fact that COB reported late-fee income consistently for 1998 and 1999 under the current-inclusion method would operate to nullify whatever consent it asserts it had received when it filed its nebulous Form 3115 with its 1998 return.

Even so, Capital One argues that, once it changed its accounting method for certain other fees to OID in 1998 and 1999, a retroactive change in the treatment of late-fee income is mere error correction to account for late fees consistently with those other fees. Capital One relies on Treasury Regulation § 1.446-1, which provides that the "correction of mathematical or posting errors, or errors in the computation of tax liability" is not a change in accounting method for which separate consent is required. Treas. Reg. § 1.446-1(e)(2)(ii)(b).

COB's desired retroactive change, however, falls well beyond the bounds of this limited exception for the correction of inadvertent error. The reporting of late fees under the current-inclusion method is not some mere mathematical error, which is "'an error in addition, subtraction, multiplication, or division.'" *Huffman v. Comm'r*, 126 T.C. 322, 344 (2006), *aff'd*, 518 F.3d 357 (6th Cir. 2008) (quoting I.R.C. § 6213(g)(2)(A)). And it is certainly not a posting error, which is a mistake in "the act of transferring an original entry to a ledger." *FPL Grp.*, 115 T.C. at 571 (internal quotation marks omitted). We therefore cannot accept Capital One's tortured reading of the regulation, which would transform a narrow provision into carte blanche to reverse a deliberate accounting choice. *See Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("In construing [a statute] in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.").

D.

Capital One made an election for the treatment of late-fee income in its 1998 and 1999 returns. It is stuck with the method of accounting it has chosen. A rule that allowed otherwise would be subject to abuse. To permit this retroactive change without the Commissioner's consent would allow a taxpayer to choose a method, sit on its hands, and then later choose another method that in hindsight was more financially

advantageous. It would invite companies to game the system by filing ambiguous forms that they could later insist meant something that was not intended at the time. And it would introduce uncertainty into administration of the tax laws if as late as seven years down the line a taxpayer was able through these sorts of strategies to retroactively reduce its taxable income by over $400,000,000.

The burden was therefore on Capital One to make its intentions and its requests to change a material item clear. Capital One failed even to mention the material item in its filing. The consent requirement serves an important function in stabilizing tax collections. To countenance its circumvention here would open the door to unilateral and retroactive changes in accounting methods with large and unpredictable implications for public revenue.

## III.

Capital One also asks that we overturn the Tax Court's decision to disallow deductions for estimated future costs related to its "MilesOne program." Under the program, cardholders earned miles for purchases made with their MilesOne credit cards. Cardholders who accumulated at least 18,000 miles had the option of redeeming those miles for an airline ticket purchased for them by Capital One. Capital One sought to deduct from income on its 1998 and 1999 returns the estimated future costs of airline tickets before customers actually redeemed their miles in exchange for tickets.

## A.

It is a well-established rule of tax accounting that for an accrual-method taxpayer such as Capital One, "deductions are to be taken in the year in which the deductible items are incurred." *Brown v. Helvering*, 291 U.S. 193, 199 (1934). By statute, an accrual-method taxpayer is prohibited under the "all-events test" from deducting a liability "any earlier than

when economic performance with respect to such item occurs." I.R.C. § 461(h). Regulation additionally requires that "all the events have occurred that establish the fact of the liability" and "the amount of the liability can be determined with reasonable accuracy." Treas. Reg. § 1.461-1(a)(2)(i).

By limiting deductions until "the obligation to pay, has become final and definite in amount," *Sec. Flour Mills Co. v. Comm'r*, 321 U.S. 281, 287 (1944), the accrual-method "produce[s] revenue ascertainable, and payable to the government, at regular intervals." *Id.* at 286 (quoting *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 365 (1931)). The all-events rule thus provides important benefits akin to those of I.R.C. § 446(e)'s consent requirement by promoting accuracy and consistency in taxpayer accounting. Accuracy is enhanced because a "taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent." *Baltimore & Ohio R.R. Co. v. Magruder*, 174 F.2d 896, 898 (4th Cir. 1949) (quoting *Sec. Flour Mills Co.*, 321 U.S. at 284). Distortions in taxable income are also minimized because costs and revenue are treated alike. *See Lucas v. Am. Code Co.*, 280 U.S. 445, 449 (1930) ("Generally speaking, the income-tax law is concerned only with realized losses, as with realized gains."). This parallel accounting treatment prevents understatement of taxable income by means of accelerated deductions accompanied by deferred gains.

Pursuant to the all-events test, Capital One would be permitted to deduct airline ticket redemption costs only when credit card holders redeemed their accumulated miles and Capital One was thereby obligated to purchase airline tickets on their behalf. Under the MilesOne program, cardholders earn miles for every dollar charged on a MilesOne credit card. Earned miles expire if not redeemed within five years. When a single mile is awarded for each dollar charged on the card, it remains unknown when the cardholder will earn the 18,000 miles necessary to qualify for an airline ticket. It also remains uncertain when, if ever, the cardholders will redeem their out-

standing accumulated miles. Therefore, the amount and timing of Capital One's liabilities with respect to airline tickets for MilesOne cardholders are not fixed until customers redeem their miles.

Capital One, however, claimed in 1998 and 1999 current deductions for estimated future ticket liabilities under the coupons-with-sales exception to the all-events test, which applies when a "taxpayer issues trading stamps or premium coupons with sales . . . and such . . . coupons are redeemable by such taxpayer in merchandise, cash, or other property." Treas. Reg. § 1.451-4(a)(1). In such circumstances, the taxpayer deducts the reasonable estimated redemption cost of the coupons from "gross receipts with respect to sales with which . . . coupons are issued." *Id.* When the regulation's conditions are satisfied, the taxpayer is able to offset sales revenue already realized against estimated costs yet to be incurred from the redemption of coupons issued with those sales. This narrow exception then, is another means of treating revenues and costs alike by pairing sales income with the costs of generating that income.

In 1998, Capital One's estimated future redemption costs were $583,411 and in 1999, they were $34,010,086. The actual costs associated with redeemed coupons for those years were $1,578 and $315,513, respectively. The reasonableness and accuracy of Capital One's estimations are not in dispute. The IRS has also stipulated that the miles issued by Capital One under the program constitute "coupons" for purposes of § 1.451-4(a)(1). The disagreement concerns whether the miles coupons were issued "with sales" within the meaning of § 1.451-4(a)(1) and whether under the regulation Capital One had "gross receipts" from which to deduct the expense associated with issuing miles.

Because credit card lending is not a sale and because Capital One did not have gross receipts to match against its estimated costs, we hold that Capital One's costs associated with

the MilesOne program do not qualify for deduction prior to the fact of liability.

B.

Regulation § 1.451-4 applies only to coupons issued "with sales," and there is no sale to speak of with respect to Capital One's MilesOne program. Capital One does not argue that the merchant's sale of goods or services to the cardholder is the relevant sale for purposes of the exception. Rather, it claims that the lending services Capital One provides constitute a sale under the regulation. We do not find this persuasive. The MilesOne card provides a convenient means for a cardholder to borrow money from Capital One while also accumulating airline miles. The issuance of miles creates an added incentive for customers to initiate and sustain a credit relationship with Capital One. The added bells and whistles of the rewards program, however, do not transform a debtor-creditor relationship into that of a buyer and seller. And they do not convert the essence of the transaction between Capital One and the cardholder from what is a loan to a sale.

We start our analysis from a presumption of deference to the agency's position. As repeatedly held by the Supreme Court, "an agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulations being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation marks omitted). In determining that the agency's interpretation of "sales" to exclude lending services is controlling we hew to the familiar principle that "statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them." *DeGanay v. Lederer*, 250 U.S. 376, 381 (1919). It is a matter of common sense and longstanding practice that "[t]he essential idea of a sale is that of an agreement or meeting of minds by which a title passes from one, and vests in another." *Butler v. Thomson*, 92 U.S. 412, 415 (1875); *see also Comm'r v. Freihofer*,

102 F.2d 787, 790 (3d Cir. 1939) ("[To constitute a sale] [t]here must be parties standing to each other in the relation of buyer and seller, their minds must assent to the same proposition, and a consideration must pass.").

To define "sales" to include lending services would thus stray far from its plain and well-established meaning. The buyer-seller relationship necessary for a sale is irreconcilable with the essence of a lending transaction, which requires that the money borrowed be repaid. *See Black's Law Dictionary* (9th ed. 2009) (to lend is to "provide (money) temporarily on condition of repayment"); *Bergquist v. Anderson-Greenwood Aviation Corp.*, 850 F.2d 1275, 1277 (8th Cir. 1988) (noting that the "hallmark of a loan" is "an absolute right to repayment of funds advanced"); *Alworth-Washburn Co. v. Helvering*, 67 F.2d 694, 696 (D.C. Cir. 1933). For that reason, we have interpreted a "sale" and a "loan" as mutually exclusive terms. In *Helvering v. Stein*, we recognized that "[t]he decisions of our courts seem to hold pretty uniformly that the original negotiation of commercial paper is a loan and not a sale." 115 F.2d 468, 471 (4th Cir. 1940). We affirmed the Board of Tax Appeals, which had reasoned that the "original negotiation whereby one gives his promise or agreement to pay to another is not a sale but is merely the borrowing of money" because "there must be a transfer of some property to another for a price in order to constitute a sale." *Stein v. Comm'r*, 40 B.T.A. 848, 853 (1939).

Capital One points out that the term "sale" for purposes of the regulation has been interpreted by the IRS more broadly than the sale of property. Specifically, the IRS rejected as too restrictive the definition of "sale" found in Section 2-106(1) of the Uniform Commercial Code, which states that a "'sale' consists in the passing of title from the seller to the buyer for a price." U.C.C. § 2-106(1). Instead, the IRS interpreted the regulation to cover "service establishments that do not sell goods or other property." I.R.S. Gen. Couns. Mem. 35,524 (Oct. 19, 1973); *see also* Rev. Rul. 78-97, 1978-1 C.B. 139

(interpreting "with sales" to cover coupons "conditioned on and solely in consideration for the purchase of goods or services"). Capital One reasons that because lending is a service —and the Tax Court recognized it as such—it must follow that lending is the *sale* of a service.

We cannot accept this inference, which stretches the term "sale" much too far. When a service is provided it does not *ipso facto* constitute a sale. The same General Counsel Memorandum that interpreted "sales" to include the sale of services emphasized that a sale under the regulation still requires that "parties stand[ ] in the relation of buyer and seller, their minds assent to the same proposition, and a consideration passes." I.R.S. Gen. Couns. Mem. 35,524. These necessary conditions of a sale are certainly not present here, where there is no buyer-seller relationship and the lender has not made a sale by extending credit to a cardholder. If anything, as the Tax Court persuasively observed, the lender is the one who stands closer to the position of a buyer, "having purchased a note receivable" by advancing funds to the merchant on the cardholder's behalf. *Capital One Fin. Corp.*, 133 T.C. at 200.

## C.

The MilesOne program does not fit the terms of the coupons-with-sales exception in another respect. The regulation provides that estimated costs be deducted from "gross receipts with respect to sales with which . . . coupons are issued." Treas. Reg. § 1.451-4(a)(1). This ensures that estimated coupon liabilities are matched against the revenue generated by the related sale. Capital One's coupons, however, are not issued in conjunction with the revenue it earns from lending services. Miles are earned as a product of purchases from merchants and not as a consequence of fees paid to Capital One.

Moreover, Capital One's fee revenues are not earned concurrently with coupon issuance and are unknown at the time

miles are earned.[2] For example, Capital One earns a large portion of its income from late fees or finance charges on cardholder loans, which are only charged if the cardholder does not pay the full monthly balance within an allotted period. It is unknown at the time the coupons are first issued whether a cardholder will incur any fees—and even if fees are later charged, it is undetermined when they will be paid. Therefore, at the time coupons are issued, there is no appropriate revenue against which to offset estimated coupon redemption costs.

Without a matching of costs and revenue, applying the coupons-with-sales exception to the rewards program would accelerate deductions both before liability and before fee income is realized. Doing so would substantially disrupt the accrual-method's matching of losses and gains and bring us far beyond the purpose of this narrow exception to the all-events test, which is to match sales income with the costs of generating that income.[3]

## D.

There is a line between a loan and a sale and it is important that we keep it bright. To characterize a loan as the sale of lending services is artful pleading and clever wordsmithing, but it is dubious law to say the least. As Capital One observes, almost every major credit card issuer has a similar rewards

---

[2]At the time of purchase, Capital One does earn income from interchange, which is a small percentage of the amount lent. The amount of interchange fees is known at the time of the purchase but the cost is borne by the merchant and is not paid by the cardholder. In addition, miles are issued based on the amount of the cardholder's purchase and not on the amount of interchange.

[3]Taxpayers also appeal an evidentiary ruling by the Tax Court disallowing at trial post-1999 financial data pertaining to revenue and expense information specific to the MilesOne program. Because Capital One's lending services do not fall within the terms of the coupons-with-sales regulation, it was not an abuse of discretion for the Tax Court to conclude that this financial data was irrelevant.

program that allows cardholders to earn "points" that may be redeemed for airline tickets or other benefits. Were we unfaithful to the plain meaning of the word "sale," every lender would claim its loans involve the sale of credit and financial institutions would accelerate their deductions merely by attaching a coupon inducement to their services. Such a result would multiply uncertainties and irregularities in the treatment of expenses and allow lenders to take speculative deductions well in advance of related revenues. This, in turn, would frustrate the goal of the accrual-method to maintain accuracy and consistency in accounting. We therefore decline to permit the narrow coupon-with-sales exception to undermine the purposes of the all-events rule. Little good and much mischief would ensue from upending the Commissioner's reasonable and longstanding interpretation of his regulation.

## IV.

For the foregoing reasons, the judgment of the Tax Court is affirmed.

*AFFIRMED*