**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1667**

G. MASON CADWELL, JR.,

　　　　　　Petitioner - Appellant,

　　　v.

COMMISSIONER OF INTERNAL REVENUE,

　　　　　　Respondent - Appellee.

Appeal from the United States Tax Court.　(Tax Ct. No. 15456-08)

Argued:　March 21, 2012　　　　Decided:　June 20, 2012

Before TRAXLER, Chief Judge, and KING and WYNN, Circuit Judges.

Affirmed by unpublished opinion.　Judge Wynn wrote the opinion, in which Chief Judge Traxler and Judge King concurred.

**ARGUED:**　Kevin J. Ryan, RYAN, MORTON & IMMS, LLC, West Chester, Pennsylvania, for Appellant.　Randolph Lyons Hutter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Richard H. Morton, RYAN, MORTON & IMMS, LLC, West Chester, Pennsylvania, for Appellant.　Tamara W. Ashford, Deputy Assistant Attorney General, Kenneth L. Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

With this appeal, Petitioner G. Mason Cadwell, Jr. challenges the United States Tax Court's determination that he had unreported income in 2004 arising from employee benefits paid for and provided by businesses owned by his family. Petitioner also argues that the tax court abused its discretion in denying his motion to amend his petition to allege a defense against an assessed tax penalty. Because we conclude that the tax court neither erred nor abused its discretion, we affirm its granting summary judgment in favor of the Commissioner of Revenue and denying Petitioner leave to amend.

I.

Petitioner, a resident of North Carolina, is married to Jennifer K. Cadwell ("Mrs. Cadwell"), and together they have two daughters, Jennifer Keady Cadwell ("Jennifer") and Miranda M. Cadwell ("Miranda") (collectively "Cadwell Family"). The Cadwell Family is engaged in two businesses related to this case. The first, Keady Limited ("Keady"), is a Pennsylvania S corporation wholly owned by Mrs. Cadwell. Mrs. Cadwell is also Keady's sole director. Petitioner served as Keady's secretary.

Keady's only income was its share of the income distributed from KSM, Limited Partnership ("KSM"). KSM, the second Cadwell Family business related to this case, is a Pennsylvania limited

2

partnership owned: ninety percent by Mrs. Cadwell; five percent by Keady; two percent by Petitioner; one and one half percent by Jennifer; and one and one half percent by Miranda. Keady is KSM's general partner.

In 2002, Petitioner and Mrs. Cadwell decided to obtain employee welfare benefits for Petitioner, Jennifer, and Miranda. According to its original terms, the benefits plan was organized as a multi-employer welfare benefit plan pursuant to Internal Revenue Code Section 419A(f)(6) and provided Petitioner, Jennifer, and Miranda with death and severance benefits. Petitioner, on behalf of Keady, signed the documentation adopting the plan.

Life insurance covering Petitioner's, Jennifer's, and Miranda's lives was selected to fund the death and severance benefits payable under the plan. For Petitioner, a universal life policy with an initial death benefit of $1 million that also accumulates cash value was selected to fund his benefit. In his life insurance policy application, Petitioner listed himself as Keady's "manager," and Jennifer and Miranda were listed on their applications as "consultants."

In 2004, the relevant tax year for this appeal, KSM paid $38,800 to the plan administrator: $36,000 to cover the plan contribution and $2,800 in plan fees. Checks to cover these costs were drawn on a KSM escrow account. The insurance company

3

that issued the life insurance policies then credited Petitioner's life insurance policy with an $18,000 payment.

In November 2004, the plan sponsor, Niche Plan Sponsors ("Niche"), sent letters to the employers participating in the multi-employer welfare benefit plan in which Petitioner and his family businesses participated, announcing that the plan had been split into single-employer welfare benefit plans. The stated reasons for the conversion included more employer control over plan assets and the concern that the plan might be subject to listed transaction penalties. Niche's letter indicated that the single-employer benefit plans no longer qualified under Internal Revenue Code Section 419A(f)(6) and that the deductibility of the employer's contributions would be limited.

Keady's resulting single-employer benefit plan was renamed the "Keady, Ltd. Welfare Benefit Plan." The new trust agreement relating to the plan provided, among other things, that the default plan administrator is the employer. Further, by December 2004, the life insurance policy covering Petitioner had a death benefit value of $1,070,529, a fund, or cash, value of $70,529, and a surrender value of $25,237.

Petitioner did not include on his Form 1040 for the 2004 tax year any income resulting from the conversion of the plan from a multi-employer benefit plan to a single-employer benefit plan. Indeed, for tax years 2002 through 2004, Petitioner filed

4

a Form 1040, U.S. Individual Income Tax Return, claiming a filing status of married filing separately, and reporting no "wages, salaries, tips, etc."

In April 2008, the Commissioner of Internal Revenue sent Petitioner a notice of deficiency claiming that Petitioner's gross income for 2004 should be increased by $102,039. The unreported income allegedly consisted of: (1) the fund value of the life insurance policy, i.e., $70,529; (2) the excess contribution to the plan of $18,000; and (3) the cost of term life insurance on Petitioner's life for 2004 of $13,510. Petitioner challenged the alleged deficiency in the tax court, but that court ruled against him, granting summary judgment in the Commissioner of Internal Revenue's favor. Petitioner now appeals to this Court.

## II.

On appeal, Petitioner argues that: the tax court mischaracterized the contributions to the plan; the plan's 2004 conversion from a multi-employer welfare benefit plan to a single-employer plan did not result in income that he should have reported; the tax court improperly valued the life insurance policy; and the tax court erred in refusing Petitioner leave to amend his petition. We address each issue in turn, reviewing the tax court's decision to grant summary judgment de

novo, Capital One Fin. Corp., & Subsidiaries v. Comm'r of Internal Revenue, 659 F.3d 316, 321 (4th Cir. 2011), and reviewing its decision to deny leave to amend for abuse of discretion. Braude v. Comm'r of Internal Revenue, 808 F.2d 1037, 1039 (4th Cir. 1986); Manzoli v. Comm'r of Internal Revenue, 904 F.2d 101, 107 (1st Cir. 1990).

A.

With his first argument, Petitioner contends that the tax court mischaracterized the contributions to the plan as income. Petitioner contends that they were not income but instead gifts from his wife. We disagree.

The Commissioner of Revenue may look through the form of a transaction to its substance. See, e.g., Gregory v. Helvering, 293 U.S. 465, 469 (1935). By contrast, a "taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." Bolger v. Comm'r of Internal Revenue, 59 T.C. 760, 767 n.4 (1973). Generally, "a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." Comm'r of Internal Revenue v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148 (1974). Because, "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax

6

consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." Id. at 149 (citations omitted).

Here, the 2004 contributions to the plan were made out of a business—not personal—bank account, namely the KSM escrow account. Further, the payments were used to fund an employee benefit plan, and Petitioner served as Keady's secretary and manager. Whether the business funds may have been "distributable"—though undisputedly not actually distributed—to Mrs. Cadwell is irrelevant. Finally, whether Keady or KSM took a corresponding employer deduction for contributions made to the employee benefits plan is of no import: Petitioner cites no authority conditioning a benefit's inclusion in income on an employer's deduction of the benefit, and we find none. We therefore conclude that the tax court did not mischaracterize the plan contributions when it refused to restyle them as spousal gifts.

### B.

Next, Petitioner contends, first, that the tax court mistakenly made no finding that the multi-employer plan in place before 2004 was qualified for tax exemption, and second, that he, for various reasons, did not realize assets from the plan in 2004. Again, we disagree.

7

With regard to Petitioner's first contention, that the tax court made no finding that the multi-employer plan in place before 2004 was qualified for tax exemption, Petitioner failed to properly raise this issue before the tax court. Indeed, the tax court noted that "[b]oth parties treat petitioner's interest in the Plan as subject to a substantial risk of forfeiture before the Plan's conversion to [a single-employer plan] on November 17, 2004. . . . [T]he issue of whether the Plan qualified pursuant to section 419(A)(f)(6) before conversion is not in issue." J.A. 242.

We thus turn to Petitioner's second contention, that he did not realize assets from the plan in 2004. Petitioner first contends that he did not realize assets from the plan in 2004 because he did not voluntarily choose to convert the multi-employer welfare benefit plan into a single-employer plan. However, Petitioner cites no authority indicating that the (in)voluntariness of the conversion is in any way relevant to analyzing this issue, and we fail to see its salience.

Petitioner also argues that he did not realize assets from the plan in 2004 because the plan assets had not vested. In this regard, 26 C.F.R. § 1.402(b)-1 provides that employer contributions made to a nonexempt employee trust must be included in gross income to the extent that the employee's interest in such contributions is "substantially vested." An

8

employee's interest in property is substantially vested when it is "either transferable or not subject to a substantial risk of forfeiture." 26 C.F.R. § 1.83-3(b).

"[W]hether a risk of forfeiture is substantial or not depends upon the facts and circumstances" of the case. 26 C.F.R. § 1.83-3(c)(1). A substantial risk of forfeiture exists "where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance . . . of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied." Id.

In this case, after the conversion of the plan from a multi-employer to a single-employer welfare benefit plan, the plan assets could be used only to pay Keady employees' claims. The conversion therefore eliminated the risk that Keady's plan assets could be used to pay other employers' claims.

Further, Keady was wholly owned by Mrs. Cadwell, Petitioner's wife, and Mrs. Cadwell appears to be the business's only director. Petitioner identified himself as Keady's "secretary" and "manager" and appears to be the business's sole officer. As Keady's sole officer, Petitioner had control over his own eligibility under the plan, as well as over decisions regarding plan assets. Therefore, when the trust's assets came

9

under Keady's control upon the plan's conversion, they became subject to Petitioner's control. Cf. 26 C.F.R. § 1.83–3(c)(3). Further, to the extent that a vesting schedule applied, the power to enforce the restrictions of the schedule against Petitioner would have been in the hands of Petitioner himself, his wife, or his daughters—i.e., individuals with an interest in the plan assets. Under these circumstances, we agree with the tax court that any restrictions on Petitioner's power to obtain the plan proceeds were illusory and that the plan assets had indeed "substantially vested" upon conversion in 2004.

Petitioner attempts to convince us otherwise by focusing on two cases that are, in any event, non-binding: Booth v. Comm'r of Internal Revenue, 108 T.C. 524 (1997), and Olmo v. Comm'r of Internal Revenue, 38 T.C.M. (CCH) 1112 (1979). Neither furthers Petitioner's cause. In Booth, the tax court needed to decide whether certain benefits constituted deferred compensation instead of a welfare benefit plan—not an issue in this case. 108 T.C. 524. In Olmo, the tax court did have to determine whether assets in employee benefit accounts had vested. 38 T.C.M. (CCH) 1112. But the circumstances in Olmo—including unrelated employees and owners, a prohibition on assignment of rights to benefits, and a requirement of additional service for additional vesting upon penalty of forfeiture—differ materially from those present here. Id.

10

In sum, we agree with the tax court that Petitioner's interest in the plan vested, i.e., was no longer subject to a substantial risk of forfeiture, in 2004. Petitioner did, therefore, have to declare his vested interest as income in 2004.

C.

Petitioner next argues that the tax court improperly valued the universal life insurance policy by considering the fund value without accounting for surrender charges. Petitioner contends that such charges must be accounted for pursuant to two recent (non-binding) tax court decisions: Schwab v. Comm'r of Internal Revenue, 136 T.C. 120 (2011), and Lowe v. Comm'r of Internal Revenue, 101 T.C.M. (CCH) 1525 (2011). We disagree.

In Schwab, the tax court addressed whether surrender charges should be considered when determining the "amount actually distributed." 136 T.C. at 121. The Schwab court expressly distinguished the operative statutory section and language, which applied to distributed insurance policies, from the statutory section and language relevant to this case, in which assets are still held in trust. Id. at 130. Similarly, in Lowe, the tax court recognized a distinction in the laws applicable, on the one hand, to "an employee beneficiary who receives the benefit of a *contribution* made by an employer to a

11

nonexempt employee trust[,]" as in Petitioner's case here, and, on the other, to "an employee who receives a *distribution* from a nonexempt employee trust[,]" as was the case in <u>Lowe</u>. 101 T.C.M. (CCH) 1525, at *4. Because the facts and law at issue in <u>Schwab</u> and <u>Lowe</u> differ materially, we cannot agree with Petitioner that they shed light on, much less control, this case and the valuation of Petitioner's universal life policy.

## D.

Finally, Petitioner argues that he should have been allowed to amend his petition over a year after its filing and less than a month before the scheduled hearing on the parties' motions for summary judgment. Again, we cannot agree.

A court may deny leave to amend a complaint or petition "when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." <u>Equal Rights Ctr. v. Niles Bolton Assocs.</u>, 602 F.3d 597, 603 (4th Cir.), <u>cert. denied</u>, 131 S. Ct. 504 (2010). Generally, "mere delay in moving to amend is not sufficient reason to deny leave to amend[;]" rather, the delay should be "accompanied by prejudice, bad faith, or futility." <u>Island Creek Coal Co. v. Lake Shore, Inc.</u>, 832 F.2d 274, 279 (4th Cir. 1987) (quotation marks omitted). Nevertheless, "the further the case progresse[s] . . ., the more likely it is that the

12

amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006).

Here, Petitioner filed the motion to amend more than a year after he filed his petition, after the parties had filed their respective motions for summary judgment, and less than a month before the scheduled hearing on the motions for summary judgment. Petitioner did not offer any excuse or justification for his delay in seeking leave to amend. He simply sought to add a new, fact-bound defense that he acted with reasonable cause and in good faith by relying upon the advice of his counsel and accountant. Consideration of that defense may well have necessitated additional discovery and, certainly, postponement of the summary judgment hearing. The prejudice posed by Petitioner's unexcused tardiness, alone, supported denying the motion to amend, and the tax court did not abuse its discretion in doing so.

## III.

In sum, we affirm the tax court's grant of summary judgment in the Commissioner of Revenue's favor, as well as the tax court's denial of Petitioner's motion for summary judgment and motion to amend his petition.

AFFIRMED

13